All rise. The United States Court of Appeals for the Federal Circuit is now open for discussion. I will update the United States in the final report.  Good morning, everyone. The first case argued this morning is No. 2010-5004, Cedillo v. Department of Health and Human Services, Ms. Jean Kaplan. May it please the Court, my name is Sylvia Jean Kaplan and I represent the Appellant Michelle Cedillo. We are here today because the lack of substantive due process was pervasive and persistent throughout the course of the omnibus proceeding and severely tainted the outcome of Michelle's case. As this Court well knows, the rules of civil procedure and the rules of evidence do not apply in this Court. And the government has used those lack of rules as both a club and a shield in their conduct in this case. But if you're concentrating your appeal on a due process argument rather than the merits, is that what we'd understand? That's true, Your Honor. What would leave then in requesting a remand for further proceedings? It would be a remand for further proceedings after the issue of the inappropriateness of the admission of the U.K. documents has been decided upon. The inappropriateness of the admission rather than the withholding of other documents? Or is your position that the whole matter should be open and not subject to the general rules of evidence and the federal rules? Well, the rules of evidence don't apply in this proceeding, Your Honor, and it's clear by legislative intent that they do not apply. The problem here is that the special masters were requiring us to go across the ocean to a foreign jurisdiction to obtain documents that were sealed by the Court over in the U.K. You mean you're talking about the documents underlying the government's expert witness testimony? Correct. Under Rule 26 of the federal rules, the government, in a case governed by the federal rules, would have to produce those documents. Your Honor, the… Correct? Correct. Under Rule 26, the parties have to produce the documents. However, the party here is not the manufacturer. The party here is the federal government. Okay, but did you make a motion to compel them to produce those documents? Your Honor, this case, the federal rules of procedure do not apply. Well, that's not quite true because under Rule 7, the vaccine rules, you can ask that the federal rules be followed. Did you make a motion to follow the federal rules in this respect, to follow Rule 26 in this respect? We did not make that motion, Your Honor. Post-hearing, the special masters requested that we get the documents, and we made an attempt to get those documents. We obtained you… Why, if you thought that it was so important, why didn't you make a motion to have, to follow that provision of Rule 26? Well, Your Honor, this is international law. If we had obtained the subpoena, we would technically have needed to go over to the U.K. Court to have them honor that subpoena. No, no, no, no, no, that's not what we're talking about. Under Rule 26, the government, if this were an ordinary civil case, the government would have an obligation to produce those materials to you. Rule 26, by its terms, doesn't apply here. However, under Rule 7 of the vaccine rules, you have a right to request that various provisions of the federal rules, as reflected in the court of claims rules, apply. And the problem is you didn't ask that the special master compel the government to bring in this underlying documentary evidence. Why didn't you do that? The government had access to three reports, Your Honor, and they indeed gave us access to those three reports. But I don't think you're answering my question. You wanted the underlying data for the three reports, for the testimony of the three witnesses. Why didn't you say, move to the special master, please compel the government to bring in these underlying data? We were ordered by the special masters to obtain the underlying data, and we attempted to fulfill that order. And we actually did contact U.K. counsel to determine whether we could seek release of these documents. We were told that for the reports of the experts, we needed to obtain consents. The consents took an incredible amount of time to obtain, and there was one consent that we could not obtain. We went back to U.K. counsel, and we asked them, what is the effect of not being able to obtain all the consents? And we were told that if the special masters applied for this as head of state to head of state, then they would look favorably upon the motion. However, when we looked at the statute, it appeared to only cover reports. And it was clear from what occurred at the hearing that what we needed was the underlying laboratory notebooks, which formed the basis for the government's argument that the O'Leary lab results were unreliable. But those are still under seal, are they not? They remain under seal, Your Honor. And so that you would have needed more than access, you would have had to have some sort of provision whereby they would be unsealed. That is correct, Your Honor, and that was what the proceeding in the U.K. would have required. And U.K. counsel at that time told us, after the sedial hearing had already occurred, that we would be required to go over there to make this presentation before the U.K. court. Well, tell you what, let's set aside this difficult procedural question. Did you want to discuss the merits of the appeal as well, or is your focus here the need for further proceedings? Your Honor, it is Petitioner's opinion that we have established a case under outlay, but for the pervasive lack of substantive due process, which tainted the entire process, that the Special Master would have recognized that as well. Well, apart from the question we were discussing a minute ago about the U.K. documents, what other pervasive violations of due process are you asserting? Well, Your Honor, the government went over there to secretly obtain these documents. They did not give us notice that they were obtaining these documents. If we had known that, we would have joined in this motion. After the documents were obtained, there was an emergency status conference called four days before the start of the hearing. And at that emergency status conference, we were told that they were going to be introducing the reports of three of the experts that they had obtained that was released by the U.K. court. Over the strenuous objection of counsel that the filing was untimely, there was highly prejudicial to the conduct of our case, and that the documents had been cherry-picked, the Special Master allowed the reports of Dr. Buston in because he was already scheduled to testify. So weren't you given an opportunity to follow up and to question and challenge that testimony? At hearing, Your Honor, Dr. Buston presented a PowerPoint presentation. And in that PowerPoint presentation, there was information that had not been unsealed by the U.K. court. And because of the lack of time to prepare for the case, we did not realize that. And that evidence was also heard by the Special Master. Well, what you're saying is in order to effectively cross-examine them, you needed the underlying documents. That's the point. Correct. That's the one central point you're making. Correct, Your Honor. And the problem with that is that you seem to have other avenues that weren't fully exhausted, including going to the U.K. court. Now, you may have been told by U.K. counsel that it wasn't likely to succeed. But why shouldn't you at least have made the request? If it were denied, then you'd go back to the Special Master and say, we're having a problem. We can't get the material. In the history of this program, Your Honor, we have never been required to go to another state, let alone go across the ocean to a foreign jurisdiction to obtain documents. It's not a question being required. It's a question, if you want the material and you think it's essential, isn't there some burden on you to exhaust the opportunities to get it? We explored that opportunity in an informal manner, Your Honor. We obtained U.K. counsel. We sought U.K. counsel to determine whether we could obtain the documents that we needed. Because the statute was so new, U.K. counsel herself was unaware. She actually sought the advice of the court. And the court indicated to them that if we sought the release of the documents, our likelihood of success would be improved, not guaranteed. It would be improved if the Special Masters made the request themselves. I thought the Special Master did join in the request. They wanted the petition to be submitted by the Special Masters. We asked the Special Masters to do so. They declined. And with that, we made the determination that without the actual application by the Special Masters, that we would not be able to obtain the underlying source data that we needed, which would be the laboratory notebooks, even if we obtained the reports. Where did we find in the record that the Special Master declined to make the request?  When we were still holding joint status conferences. Can you show us where in the record that was done? It's not present in the record, Your Honor. It's not in the record? It was an unrecorded status conference, Your Honor. Is this the status conference or argument that took place on July 7, 2009? I beg your pardon? Is this the argument that took place on July 7, 2009 that you're referring to? That was a proceeding where the court asked you how the Special Masters' handling of Dr. Buston's reports prejudiced the Sedillas if at all. And according to the opinion, Petitioner's counsel could not identify any prejudice aside from short-term disruption. That's not the status conference, Your Honor. That was the oral argument before the claims court, which was made by my partner. And he's a very fine appellate attorney, but I was the trial attorney in the matter. And I can tell you that it severely affected the ability to prove Michelle Sedilla's case. But as Judge Lynn says, wasn't there a concession in the argument before the Court of Federal Claims that there hadn't been any prejudice as a result of that? Mr. Conway did make that statement, Your Honor. And I am telling you, as a trial attorney, the inability to review the documents in a timely manner, let alone understand the complexity of the documents, and the inability to recognize that additional information was being introduced because we were not given the opportunity to review the disputed documents, severely affected our ability to cross-examine and to conduct our case. Well, according to the Court of Federal Claims' opinion, reporting on that oral argument again, from the record, counsel explained that he thought Dr. Buston was helpful to the Sedilla's case, admitting, quote, there was no ultimate prejudice from Dr. Buston. That's in the record. And that goes to the merits of the case, Your Honor. And it is true that even though Dr. Buston had presented information that he was not permitted to release, that information actually supported what Petitioner was asserting about the high cell count. However, the Special Master totally discounted that information because he said that the report had not been submitted to him. And that's where the prejudice also arises from. So while the government is able to use the information to support their case, while when we cite that information in support of our argument, the Special Master then turns around and indicates that because the report is not present, it doesn't support our case, but yet it supports what the government is saying. That's simply an unequal application of the evidence. And it's simply more proof of the fact that the denial of due process was pervasive and persistent throughout the course. And it's much like the fruits of the poison tree in criminal law. Once that fateful error is made, all the evidence that flows from that fateful admission taints the process. And it's Michele Sedillo's opinion that that tainted her entire process, affected the deliberations of the Special Master adversely to her disadvantage. Now, in addition to that, because the U.K. documents were allowed in the three reports, Dr. Weemer was permitted to testify in the Snyder hearing. Now, it was always the understanding of petitioners that one Special Master would deliberate on the general causation testimony and the other two Special Masters would just simply evaluate the individual cases. Because it was our understanding that that was how the omnibus proceeding was to occur, and because it had always occurred in that manner in the past, and it had always occurred in that manner after the autism omnibus proceeding, we didn't believe that there was a need to attend. However, during the Snyder hearing, Professor Weemer testified about Michele Sedillo. He testified that her cell count was too high to be believable, but he made a calculation error. And because we were not present at the time, we did not know about that calculation error until the decision came up, when we discovered that he had relied on Professor Weemer's miscalculation in his decision ruling against Michele. When we discovered that, we filed a motion for reconsideration. And in that motion for reconsideration, we alleged other factors which we believe supported our case, information that had not been available at the time of hearing. Now, the Special Master denied the motion, claiming that it was untimely. However, he then went ahead, proceeded to evaluate the merits of three of the four issues that we raised, indicated that it would not have altered his opinion, but yet failed to discuss the calculation error which undermined Dr. Weemer's opinion that Michele Sedillo's biopsy cell count was too high. And that was a clear error. And while it may have been untimely filed, Your Honor, this case involves, was the test case for potentially 5,000 other cases. The case was filed in 1998. The hearing took almost three weeks. It took them 18 months to issue a decision. What harm would it have done to just withdraw his decision to properly evaluate the testimony that had not been available at the time of hearing and make a determination, in fact, that it did not affect the outcome? Well, he found that the evidence aside from the Campbell article was available. Is that wrong? With all due respect to the Special Master, the textbook by Dr. Zimmerman was published sometime in January of 2009. His decision came out in February of 2009. It's a textbook. It takes time to read a textbook. Not only that, while the Campbell article may have been available, it was our impression that we had established our case by the outcome standards. And when it was discovered that he was claiming the unreliability of the O'Leary primers, were in fact partially supported by what was the testimony by Dr. Buston, which included testimony that had not been released by the UK court, and included a gross mathematical error by Dr. Remer, then it would appear that fundamental fairness would require that he withdraw his decision to at least give a deliberate deliberation as to how it would have affected the outcome of the case. If we agree that there were seriously significant flaws in the procedures, nonetheless, looking at the evidence which was before the Special Master and that which might have been deduced from the sealed notebooks, don't you still have a very difficult problem in the current state of the science to demonstrate causation? Your Honor, it was our belief at the time of hearing that we had established sufficient evidence under the outcome standards. And I'm sure this Court knows what the outcome standards are. We presented evidence which indicated that there was a medical theory on how these vaccines could lead to the development of brain damage in Michelle Cedillo's case. Well, at the present state of the law, which perhaps is inapplicable and needs to be reviewed, a medical theory or a plausibility is insufficient to establish more likely than not, or to meet the Dalbert standards. Well, Your Honor, outcome still remains good law as best as we can determine, and the outcome court indicated that, concisely stated, so long as Petitioner provides a medical theory that has a logical sequence of cause and effect with an adequate temporal relationship and they establish this by a preponderance of the evidence, then they have met their burden. And the burden shifts to the government to prove causes unrelated. We had a medical theory. Plausibility to some people, for whatever reason, seems to me possible, but plausibility in the scientific and medical world means that it makes sense, thinking it through from a scientific and medical standpoint, that this can occur. So you think that the more likely than not standard shouldn't apply? It remains more likely than not with a plausible standard because we must still establish that there is a logical sequence of cause and effect and that the temporal relationship is appropriate. All those factors are what constitutes preponderant evidence. And once we have established preponderant evidence, unless the government can establish that there is no alternative cause, then we have met our burden.  Well, before the government is required to establish no alternative cause, you must first establish a prima facie case for some cause, some connection. It's not simply a theory, but some prima facie showing of causation. You're absolutely right, Your Honor. And in this case, the special master looked at all of the evidence and concluded that the prima facie case had not been established. The problem, however, was that his evaluation of the merits of that case was entirely tainted by the admissibility of documents which should not have been allowed in at the time. But he said that he would have reached the same result even absent the Buston testimony. That's what he said, Your Honor. And I looked at what he would have relied upon. And in the absence of the three U.K. experts that came in to testify for the three respective cases, he would have relied on the fact that we had not established that measles vaccine was present in Michelle Sedil's brain, causing her neuroinflammation, that no other laboratory was able to find an agreement with the O'Leary Laboratory, and that the ward paper apparently demonstrated that the O'Leary primers were nonspecific. Well, Your Honor, we will never have direct evidence that measles vaccine is causing the neuroinflammation in Michelle Sedil's brain. We have circumstantial evidence. Michelle was never exposed to wild measles virus. There was never an indication that there was an outbreak of measles virus in where she lived. It sounds as though you're asking us to re-weigh the evidence, which really isn't our task. I beg your pardon? It sounds as though you're asking us to re-weigh the evidence, and that isn't our job. You're absolutely right, Your Honor. It's not your job. What I am here saying is that the lack of substantive due process was so pervasive and so persistent throughout the omnibus proceeding that it severely affected the special master's ability to weigh the evidence properly. And we are asking that you find that the admission of the U.K. documents was improper and remand it back with an eye to reopening the proceedings without the presence of the U.K. documents. All right. Let's hear from the government, and we'll save you rebuttal time. Thank you. Ms. Riccadela. Good morning. May it please the Court. My name is Lynn Riccadela, and I represent the Secretary of Health and Human Services. Your Honor, as we stated— The government's position that you can put on an expert witness without putting on the underlying documents seems to me troubling. If this were a proceeding governed by the Federal Rules of Civil Procedure, Rule 26, you'd have to produce the underlying documents, and if you didn't, the witness's testimony would be excluded, correct? That is correct, Your Honor. Why should vaccine proceedings be different? I understand that the Federal rules don't technically apply here, but that seems to be a matter of fundamental fairness, that if a witness is going to testify, that the other side should get the underlying materials to enable them to cross-examine. Your Honor, we don't even know if the underlying materials exist. We don't know what's— Well, that's your problem, you know? If they don't exist, maybe the witness's testimony should be excluded, too. But under the Federal rules, it's your job, if you want to put on a witness, to produce the material that the witness relied on. With all due respect, we tried, Your Honor. We actually—our initial— when we first went to the United Kingdom, we tried to get as much as we could. We tried to get the petitioner's expert reports that we filed in the United Kingdom. We tried to get everything. Was the petitioner and petitioner's counsel present and accompanying these various expeditions to try and get the evidence from England? No. In February of 2007, when the petitioners in the Citio case first filed their expert reports, that's the first time that the government became aware that the results from the genetics were going to be vitally important in this litigation. Was the petitioner notified that this was going on? No. We went to the United Kingdom on our own to try to get as much as we could. I mean, we're in the process of putting our case to— No, but this isn't an adversary proceeding. The idea here is to find the truth, the scientific facts, causation, or what's known, and to implement the policy of the statute. It's not a matter of surprise. This wasn't a surreptitious proceeding. With all due respect to Ms. Jim Hammond— It might not have been surreptitious, but wasn't there an obligation? I don't—respectfully, Your Honor, I don't believe so. I mean, we had to hustle, to use a colloquial term. The trial was scheduled for June. We didn't know until the end of February of 2007 that unigenetics was going to be vitally important in this litigation. What did you do to try to get the underlying data? We made an application. We first consulted with solicitors in the United Kingdom because the United Kingdom has a special proceeding where these things are under seal. It takes an actual act of court to unseal them. We went to the solicitors in the United Kingdom saying, we want all these reports. We didn't really know what was there— No, no, no, no, forget reports. We're not talking about reports. We're talking about the underlying data. What did you do to try to get the underlying data? We went to the solicitor and we said, we would like everything that we could possibly get our hands on that pertains to unigenetics, underlying data, all the reports, both reports that were filed on behalf of the claimants in the United Kingdom and reports on behalf of the manufacturers. Our solicitors, after putting the package together, said, you know, your application is going to be denied. It's too broad. You need to hone in on what you really want because this was a case of first impression in the United Kingdom. This had never been done before. It was a rule of law that had just been created. Did you do that? And our solicitors said, yes. We honed it down to the three that we were able to get. Three what? The three reports. What about the underlying data? Did you ask for the underlying data? I don't believe so, but we were under counsel from our solicitors. I understand not asking for the underlying data. You knew you were going to put in Buston's testimony. Why didn't you ask for the underlying data from the U.K. courts? That would seem to be fundamental. What more important than the other expert reports that were put in in the U.K. proceeding? Well, Your Honor, it was a decision made by our solicitors in the United Kingdom as to what they thought would be our best chance of getting any information, and we relied on their leaders. And who sealed the notebooks? The United Kingdom. It's a rule of law they have that these type of proceedings are under seal, that you have to move. And, again, this is the first time that this type of proceeding was allowed to be unsealed up until this particular rule of law was established just months before we made our application. You were asked to have the Buston report unsealed, right? Correct. And you succeeded? Correct. And when you did that, you didn't ask to have the underlying data unsealed as well? No, we did not. I find that a little strange. Well, once again, I don't know what else to say other than we relied on the legal advice of our solicitors as to what would optimize our chances of getting anything. And we got the report. Well, what you got was what you wanted, the Buston report that you could put in without asking for the material that would allow for effective cross-examination of Buston. That doesn't look right, does it? I respectfully disagree. We asked for what we thought we'd have the best chance of getting. Again, this Court, the special masters left the record open for more than one year. We actually told the petitioners after the Cedillo case was over, we would join in another application to try to get any underlying data, any ex reports that were filed by the claimants. The three special masters signed and wrote a letter and submitted it to the United Kingdom Court saying that we would really appreciate that you unseal these documents. The petitioners never even filed an application. They never tried. And I understand it's difficult, but they never tried. Do you think it would have been granted if they'd tried? Your Honor, I have no way to know. I have no way to know. But, you know, again, this is not supposed to be an adversary proceeding. This is a matter of the public interest of getting to the truth, again, the scientific truth, as well as one can in an area which is full of unknowns and uncertainties, and then applying government policy. And yet you're asking us to apply Daubert and other cases which arose in other contexts, and some of which are quite rigorous as far as admissibility is concerned, with respect to the underlying data. You tell us that this or that hazard has not been peer-reviewed, and yet here we are in a context in which what one might call a selected conclusion, not subject to cross-examination on the data, is relied on as dispositive. Isn't that troublesome to the government? I beg to differ with you. We were trying to be adversarial. We had to put our entire case together in a matter of three or four months. We made the application to the United Kingdom. This is a process that just doesn't happen overnight. Were you oppressed? Were you denied adequate time? You were saying you had to put your whole case together in three or four months. Well, the way that the construct of the LAP, the petitioners filed their expert reports, in fact, the end of February 2007, we were going to trial in early June of 2007, so we had to not only assemble our experts, file their expert reports, prepare our cross-direct examinations in a period of just three or four months. So it was a very, very short time period. At the same time, we were working on our case on this side of the ocean. We were trying with our solicitors in the United Kingdom to obtain, again, we wanted to get more. We wanted to get the underlying data. We wanted to get the petition. But you didn't ask for it in the beginning. You asked for the Boston report. You didn't ask for the underlying data. I think what's getting lost here is the fact that the special master stated unequivocally that he didn't rely on Dr. Buston. He didn't need Dr. Buston. He didn't need Dr. Rema. He didn't need the other expert report that we filed from the United Kingdom. There was ample independent evidence showing the unreliability of genetics. The fact that unigenetics never published their data to let the scientific community scrutinize their findings. The fact that numerous other laboratories tried to replicate the unigenetics data and could not. That, the special master found, was very persuasive. And he specifically stated he did not need Dr. Buston. So the fact that the petitioner, if this court believes we're not able to adequately cross-examine Dr. Buston, at the end of the day, that did not affect the outcome of this decision. Well, you know, the thing that is particularly troublesome in an area such as this, where almost daily or weekly one sees scientific advances in terms of understanding brain function and neurological changes, measurements of aspects of disease and other manifestations that not too long ago were deemed beyond the reach of science. And so to understand, it may indeed be that at the current state of the science, that depending on where one puts the presumptions and the burdens of proof, that it hasn't reached the stage of establishing causation within what the statute may seem to require for causation. But to put this in the context of the progress of science, one really does need to understand the basis for the reports and the expert opinions that are being relied on today. Because a week from now or a year from now, there may be totally different through functional MRI or some of the other relatively new methods of evaluating brain function, which would have an impact. But if, in fact, there hasn't been access, then you're asking us nonetheless to rely on reports on the present state of the science without adequate time for cross-examination, for example. Again, isn't that troublesome to the government in what's supposed to be a non-unnecessary proceeding? Again, I think we need to look at the statute compels the session master under Section 13A to look at the record as a whole. His 174-page decision reflects that he did just that. I mean, this case is so much more than Dr. Buston's reports. This case, as Ms. Chincaplin said, is three weeks' worth of testimony. Judge Newman, I know you alluded to this during the Hazelhurst argument, your concern that science continues to evolve. That's absolutely right. Science is an ongoing process. But the law needs to be somewhat finite. In fact, the Supreme Court in Daubert addressed your concern, Your Honor, saying the scientific conclusions are subject to perpetual revision, but the law, on the other hand, must resolve disputes fairly, finally, and quickly. But Daubert requires a 95% confidence level. This statute requires more likely than not. Respectfully, I believe that there's a confusion over confidence. Confidence intervals don't deal with causation. Confidence intervals in a study deal with the percentage of... What's the percent of the results are random? No, I agree. That's accurate. Causation. That's accurate. However, it's hard to say that Daubert really presents a more likely than not standard for causation. I'm sorry, that Daubert? Daubert. I mean, which the special master relied on. Daubert, he didn't rely on Daubert for causation. He relied on Daubert to assess the reliability of the evidence that was before him and how he weighed that evidence. But Daubert is not what you need to prove causation. Daubert is what a special master in his discretionary ability, the factors he uses to assess the reliability of the evidence that's before him. Well, it sounds a bit inconsistent to strictly apply Daubert and not to follow the usual rules with respect to expert witnesses about presenting underlying data. How is he supposed to make an effective Daubert determination unless he sees the whole picture? Well, I mean, I agree with you. But again, we have to look at the other evidence that the special master had. I understand that argument. But does that suggest that you agree that Buston's testimony should not have been admitted without the underlying data? Not at all, Your Honor. The Vaccine Act favors inclusion of evidence. Would it have been better and would it have been better for both parties? I mean, frankly, we would have loved to have seen the underlying data because it would have buttressed Dr. Buston's testimony. Well, how do we know that? We don't, but I mean, how do we know that it won't? Well, that's the point, you know? You're not supposed to guess about it. You're supposed to get the data. You should have gotten the data and turned it over and used it yourself. No? We did not. I mean, we have to work with the facts that we were given. The Court believes it's error. What I'm trying to say is you have to look at Dr. Buston's. His reports are also buttressed by the fact that what he's saying is also what the scientific community is saying, that these other laboratories tried to replicate the data. They could not. You can't just throw out Dr. Buston's testimony. He said the O'Leary Laboratory or Unigenetics or whatever it was, a bad laboratory. They did bad work, right? Correct. And he relied on their documents to reach that conclusion. And I don't know how you could possibly effectively cross-examine him on that point without having the documents that he looked at. Do you think you could effectively cross-examine without the documents? I think I could have cross-examined him. Would it have been as effective as if I didn't have the documents? No, I agree with you, but the petitioners also had experts who testified for them in this litigation that testified in the United Kingdom who were privy to some of the underlying documents from Unigenetics and who were privy to what happened in the United Kingdom. Some of them. Some of the documents. Not all of them. Right? I do not know. I do not know. But they were not without witnesses to address the subject, and the witnesses attempted to address the subject, Dr. Schaffner and Dr. Kennedy, and Special Master Hastings listened to what they had to say. At the end of the day, he felt that respondents' experts were far more persuasive on the subject, were better qualified, and just had a better command of the facts. I see I'm out of time, unless the Court has... Let's see if we have any more questions for you. Thank you. Thank you. Ms. Jim Kaplan, you have a couple of minutes for rebuttal. Thank you, Your Honor. I just wanted to make two points here. The first is that if we had known that the respondent was going over to the UK to seek the documents to be unsealed, we would have joined in that effort. And if we had known back in February, we would have had an additional four months before the beginning of the hearing to make a determination whether these documents could be obtained. And if they could be obtained, we could have made a timely motion to jointly continue the hearing. As it was, because it was unknown to us and it was sprung on us at the last minute, I made a motion to continue the hearing, which was denied twice by the Special Master. But he gave you a year to try to get the documents, didn't he? They gave us a year, Your Honor. However, when you're given an impossible task to achieve, the opportunity to achieve that task is a mere illusion of substance. Well, how do we know it was impossible? That's the problem. You didn't make the request. It was clear from our conversations with the UK barrister that in the absence of consents from all the experts that we sought, that we would not get those documents. And even if we had the consents, there was no guarantee that we would get the underlying documents that we needed, which was the laboratory notebooks. And without a guarantee of the ability to obtain these laboratory notebooks, which is really the core of the case here, then it seemed that we would be wasting the taxpayers' money. Because not only would we have needed to obtain a barrister and a solicitor, as the government did, but we would be required to go over to the UK geography or the UK court to obtain these documents. And in the end, we weren't certain, because Dr. O'Leary's lab was based in Ireland, whether we would also need to make that application in Ireland. And if we made that application in Ireland, would the UK court have jurisdiction? It was very complicated international law considerations that, quite frankly, I've never had to deal with in civil practice or in the vaccine program. Did you make all of these points to the special master? Yes. That's all of the prejudice that was resulting from this predicament you were in? When we made the decision that we were unable to obtain the documents, we told the special master in a joint status conference, and present at that time also was Mr. Powers, who represented the Petitioner's Steering Committee. I represented the Cedillo family. In our motions, as well as our briefs, I believe that we have made clear that the denial of substantive due process here has severely tainted our ability to represent Cedillo. But then the only available relief would have been to have excluded the report. Is that right? Would that have helped you? We didn't make a motion to strike Dr. Buston's testimony at the beginning of hearing. We made a motion to preclude him from testifying at the time that he was supposed to testify. We made a motion to strike his testimony at the conclusion of the hearing. They were all denied. And you made those motions on the ground that you didn't have the underlying data? We made the motions on, yes, I believe the motion to strike at the conclusion of the hearing was based on the fact that we did not have the underlying data, which was the laboratory notebooks. But still, are you saying that with the report excluded, and the testimony excluded, and the data unavailable, that you could have made your case of more likely than not of causation? We believe we could have, Your Honor, because it would have excluded all the U.K. testimony. The U.K. testimony that really could not be challenged because we were not able to get the source documents. But then there's even less evidence of any sort. There would be, in my opinion, virtually no evidence that the laboratory is unreliable. And that seems to be the crux of the issue here. Okay. Any more questions? Any more questions? Thank you. Thank you both. The case is well argued. Thank you both. You do a hard job.